UNITED STATES of America

v.

Jorge JUAN, Defendant.

No. Crim 98–10233–NG.

United States District Court,
D. Massachusetts.

July 29, 1999.

James W. Gilden, Brookline, MA, for Joel Juan aka Edward Ramos, defendant.

William H. Keefe, Jamaica Plain, MA, for Jorge Juan, defendant.

Heidi E. Brieger, United States Attorney's Office, Boston, MA, for U.S.

### SENTENCING MEMORANDUM

GERTNER, District Judge.

Jorge Juan ("Juan") pleaded guilty to Conspiracy to Possess with Intent to Distribute Cocaine in violation of 21 U.S.C. § 846, and four counts of Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a). The plea agreement reserved only one issue to be litigated—whether the sentence would be increased under U.S.S.G. § 2D1.1(b)(1) because of a gun found on Juan's premises at the time of his arrest. That issue also has an impact on another—Juan's eligibility for the

so-called "safety valve"—U.S.S.G. § 5C1.2. If the gun enhancement applied, Juan would be disqualified; if it did not, he would be eligible for a two-level reduction pursuant to U.S.S.G. § 5C1.2.[1]

On July 1, 1998, when Juan was arrested, an unloaded .38 Ruger gun was found in the basement of his three-level townhouse at 74 Chestnut Street, Jamaica Plain, Massachusetts. In an affidavit, Juan acknowledged that he purchased the gun several years before his arrest. No one contests the fact that the gun was lawfully owned. The central factual question is the gun's *relationship* to the instant offense. Before I can answer that question, however, I must first resolve the ambiguity presented by U.S.S.G. § 2D1.1(b)(1)—(i) whether, and to what extent a relationship between the gun and the offense is required by that Guideline, and (ii) the nature and allocations of the burdens of proof with respect to the issue.

I held an evidentiary hearing at which exhibits were presented, and three witnesses testified: DEA Special Agent Robert Kew and DEA Special Agent Jeffrey Stratton for the government, and Belkis Aquino for the defense. The parties were given an opportunity to brief the issues and argue them fully.

I concluded that the enhancement under U.S.S.G. § 2D1.1(b)(1) did not apply. Rejecting the government's argument to the contrary, I found that the burden of proving the gun enhancement remains always with the government, a burden that it did not meet in the instant case.

## I. *GUIDELINE CALCULATIONS*

*Base Offense Level:*

The base offense level under U.S.S.G. § 2D1.1(c) for offenses involving at least 2 kilograms but less than 3.5 kilograms is **28**.

*Specific Offense Characteristics:*

The government maintains that a 2 point offense level enhancement is warranted under U.S.S.G. § 2D1.1(b)(1), which increases the base offense level, because "a dangerous weapon was possessed." As discussed below, I concluded that the enhancement did not apply. As a result, Juan met criteria (1)–(5) of U.S.S.G. § 5C1.2 and qualified for a 2 level reduction.

**Minus 2**

*Acceptance of Responsibility:*

Due to Juan's guilty plea, he is entitled to a 3 level reduction under U.S.S.G. § 3E1.1(b).

**Minus 3**

*Total Offense Level:*

Juan's total offense level of 23, and a criminal history category of I, yields a sentencing range of 46 to 57 months. In deference to Juan's background and the life he has made for himself in this country, I sentenced him to 46 months, the low end of the guidelines.

## II. *BACKGROUND*

Juan is a 41 year old legal permanent resident from Cuba. At age 26 he attempted to swim from Cuba to the United States, but failed. As a result, he spent eighteen months in a Cuban jail. He finally made it to this country in 1992, eight years later, and was granted political asylum. Shortly thereafter, he moved to Boston. He started a successful grocery store, the Hillside Market, which he ran for seven years, apparently in a law abid-

---

1. Juan initially argued that the standards were different for establishing eligibility for U.S.S.G. § 5C1.2(2)—"possession of a firearm in connection with the offense,"—than they were for applying the U.S.S.G. § 2D1.1(b)(1)—enhancement if a dangerous weapon was "possessed." In other words, even if the gun enhancement applied, he contended that he could still be eligible for the safety valve. He ultimately abandoned the argument. The parties agreed that they would not otherwise contest Juan's eligibility for the safety valve.

ing fashion. He has a family which he supports, including his partner Belkis Aquino ("Aquino"), their three year old daughter, and a ten year old child and elderly mother who still live in Cuba.

In January of 1998, the government, investigating drug trafficking in the Jamaica Plain area, received information that Juan might be distributing multiple ounce quantities of cocaine in the Hillside Market. A Confidential Government Source ("CS") was introduced to Juan. After a number of conversations between them, the CS participated in several hand-to-hand drug transactions with Juan. All of the CS's information and observations pointed to the Hillside Market as the principal locus of drug dealing.

The CS generally contacted Juan at the Hillside Market, where he observed numerous individuals coming to meet with Juan in a closed room, off to the side of the store. The first transaction between Juan and the CS, on April 10, 1998, started at the Hillside Market, and eventually moved to the house at 74 Chestnut Street where Juan retrieved the drugs. A second transaction, on April 22, 1998, took place at a restaurant, El Oriental de Cuba. A third transaction, on May 6, 1998, took place at another apartment, 40 Fairlawn Avenue. Finally, a fourth transaction, on July 1, 1998, began at the 3D's bar in Jamaica Plain, and ended in the basement of 74 Chestnut Avenue, where Juan was arrested before either drugs—brought into the house for this specific transaction—or money were exchanged.

Throughout all of the transactions and the twenty taped conversations,[2] no gun was ever seen or mentioned. No violence was-ever threatened.

On July 1, 1998, Juan was arrested. The house was searched, and the only drugs recovered were those involved in the instant offense. While an unloaded .38 Ruger gun was found in the basement of the apartment, there was considerable confusion among the government agents that searched and secured the house as to who found the gun, when, and most significantly, where it was found. Indeed, the Pre-Sentence Report, the hearing testimony, and the filings by the parties present a number of different possible locations:

*Version 1*

Probation Officer Griffin ("Griffin"), doing his own investigation before he received the government's version of the offense, was instructed by DEA Agent Mastracola ("Mastracola") to speak with a Boston Police Officer, Officer McCarthy ("McCarthy") about the offense. The first time Griffin learned that a gun had been seized was in his conversation with McCarthy. Griffin reported at the evidentiary hearing that McCarthy indicated that the gun was located in a sock behind a door.[3] (There was no indication of which door, locked or unlocked, closet or main door).[4]

*Version 2*

At the evidentiary hearing, DEA Special Agent Kew ("Kew") contradicted McCarthy in two respects. First, Kew testified that *he* was the one who seized the gun, not McCarthy, and second, that the gun was located inside of a sock on a window ledge next to the basement exit door of the apartment. Kew described how he had been present to secure the basement while

---

**2.** According to Juan's sentencing brief, there were at least twenty conversations between Juan and the CS that were recorded, and many more that were not. The CS did not recall Juan ever displaying or mentioning a gun in any of these discussions—recorded or unrecorded.

**3.** In the Pre–Sentence Report, Griffin elaborated further, stating that the gun was

wrapped in a *towel*, rather than a sock, and was located next to the doorjamb of the basement door.

**4.** A Boston police incident report, prepared by Sergeant Detective Paul Donovan, indicates that the gun was seized by McCarthy. The DEA agents contested this during the hearing.

a search of the room was conducted. Between thirty minutes to an hour and a half after the officers entered the house, the gun "was found."[5] Although he had been the first one to enter, was the arresting officer, and was responsible for securing the 20 × 15 square foot room,[6] it was not until he was standing at the door to the apartment, conversing with other agents and neighborhood kids, that Kew first noticed the sock with the gun inside, right on a window ledge beside him.[7]

### Version 3

Kew's oral submission to Mastracola recounted yet another version of where the gun was located. According to Mastracola's written report, Kew stated he found the gun on a wooden molding, not a window ledge.[8]

Given the size of the sock and of the gun, which were admitted as exhibits, the sock would have hugged the sides of the gun closely. Anyone looking at it, and in particular trained officers, would have understood what the sock contained. If the gun had been in plain view, as Kew's testimony clearly suggests, it is inconceivable that he would not have seen it earlier while he was securing the basement at the time of the arrest. Indeed, the best explanation for Kew's testimony is that the gun was not in plain view at all; it had been put away.

5. Kew stated that the gun was not found until Juan had been removed from the apartment. Kew also stated that Juan was held in the basement for at least a half an hour, if not more, before he was finally removed.

6. Kew stated that he did not search the premises other than to lift the cushions on a couch to check for weapons after arresting Juan.

7. Agent Stratton ("Stratton") testified that he observed Kew find the gun just as was described in Kew's testimony. Stratton also testified, however, that he and the other officers entered the townhouse through the door right beside where the gun was found—presumably he would have walked past it. Stratton participated in a sweep of the basement and the rest of the house, and helped to search the laundry room and the kitchen up-

### Version 4

In an affidavit, Juan stated that he had purchased the gun several years before he was arrested to protect his store, the Hillside Market. He reported that he was personally robbed twice, and that there were two armed robberies at the store. Once the robberies apparently stopped, he stated that he took the gun home, and secured it, unloaded, behind a television set (to make certain that neither his companion nor his three year old child would find it). He then forgot about it.

Juan's partner, Aquino, testified that she never noticed the gun in the basement although she had been down in that area countless times, including the morning of the arrest. To be sure, Aquino also indicated that she knew nothing of Juan's cocaine trafficking activities taking place in the basement, and suspected nothing.

## III. *LEGAL ANALYSIS*

U.S.S.G. § 2D1.1(b)(1) states:

If a dangerous weapon (including a firearm) was possessed, increase by 2 levels.

The government argues that the relevant standard for satisfying this enhancement is found in the Commentary to the Guideline—"[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon

stairs. As I noted above, the gun was effectively in plain view. It was contained inside a small sock and would have readily revealed its shape through the outlines of the sock. In any event, Stratton did not document his observations in any form of a written report. Moreover, he was present in the courtroom when Kew testified. Defense counsel noted, after the fact, that he had intended to seek Stratton's sequestration. Under the circumstances, I do not regard Stratton's testimony as providing substantial corroboration to Kew's.

8. Juan indicated at both the hearing and in his filings, that a description of the locus of the gun as on a "wooden molding" was more consistent with finding it on or around the entertainment center, where the television was located, than on the window ledge.

was connected with the offense"—as that standard was interpreted by the First Circuit in *United States v. Corcimiglia*, 967 F.2d 724 (1st Cir.1992). According to the government, it need only prove presence of a firearm in the room where the drugs were found; at that point the burden of proof shifts to Juan to prove that it is "clearly improbable that the weapon was connected to the offense." Juan's proof, the government maintains, cannot meet that burden.

Juan disagrees with both the standard— "clearly improbable"—and with the allocation of the burden of proof. In any event, he suggests that he meets the burden of showing that it is "clearly improbable" that the gun was connected with the offense.

## A. *What Relation Does the Firearm Have to Bear to the Offense?*

### 1. *The Language of the Guidelines*

The use of the word "possession" in U.S.S.G. § 2D1.1(b)(1) is not entirely clear: Does it mean actual possession, or constructive possession? How much of a connection does it require to the offense, i.e. is

it temporal, possession during the offense, possession "in furtherance of" the offense, possession "in relation to" the offense, or some other category? [9]

It is clear that the relationship is not temporal. Prior to 1991, U.S.S.G. § 2D1.1(b)(1) read:

"If a firearm or other dangerous weapon was possessed *during the commission of the offense*, increase by 2 levels." (Emphasis added).

In 1991, the Sentencing Commission took out the phrase "during commission of the offense," leaving only the requirement of possession.

The Commission did not say why. It never does. Unlike most administrative agencies of the federal government, the Sentencing Commission does not have to hold public hearings or offer detailed explanations for the change, or provide any legislative history. For the most part, the Commission is not subject to the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*, as are agencies dealing with far less weighty areas.[10] It need only propose the

9. In its First Reply to Juan's Sentencing Memorandum, the government concedes that a nexus is required; citing *United States v. Lagasse*, 87 F.3d 18, 23 (1st Cir.1996) for the proposition that "Section 2D1.1 required a 'nexus between weapon and the offense' for the application of the enhancement." Likewise does the Commentary to the Guideline:
 "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. 3.

10. The Sentencing Reform Act required that the Commission publish proposed amendments and receive comment on them prior to their final promulgation. *See* 28 U.S.C. § 994(x). The statute, however, did not impose any of the other procedural requirements that generally govern federal agencies. In 1996, nine years after it was created, the Commission finally proposed rules to govern its own internal practices and procedures. *See* 61 Fed.Reg. 52, 825 (October 8, 1996); 61 Fed.Reg. 39, 493 (July 29, 1996). While the regulations of other federal agencies may be challenged as "arbitrary" or "capricious" under 5 U.S.C. § 706(2)(A), the Commission's Guidelines are not subject to such challenges.

It is for this reason that two noted scholars of the Guidelines call them "simply a compilation of administrative diktats," a "set of unexplained directives." They added: "In the absence of some reasoned explanation for a particular rule, it is difficult to understand, much less defend, the rule. Unless there is reason to believe that the Commission has some unusual capacity to discover important or eternal truths, its argument from authority leaves the Guidelines with little or no independent validity or legitimacy." Kate Stith and Jose A. Cabranes, *Judging Under the Federal Sentencing Guidelines*, 91 Nw.U.L.Rev. 1247, 1271–72 (Summer 1997).

As one scholar indicated:
"The Commission does not have a regularized process for accepting or responding to petitions for the issuance of new guidelines. Its advisory committees do not hold open meetings, and the Commission's own open meetings have not been the locus for all serious policy decisions.... Perhaps the most glaring shortcoming in the federal [Sentencing] Commission's process is its 'statement of basis and purpose' for final guideline amendments. While most rule making agencies provide thorough expla-

change, allow a period for comments—which it need not accept—and then submit the change to the Congress. In this case, Congress too accepted the change without explanation.

Even if a temporal connection is no longer required—for whatever reason—I must still determine the extent of the relationship required between the gun and the offense; is it possession "in furtherance of" the offense, or possession "in relation to" the offense [11], or some other standard?

In answering this question I will use the traditional tools—the general principles of construction, the purpose of the Guideline, and the case law.

### 2. General Principles of Construction

 The Guidelines are subject to strict construction, as are all criminal laws. *See United States v. DiPina*, 178 F.3d 68, 1999 WL 330194, *2 (1st Cir.) (citing *United States v. Khang*, 904 F.2d 1219, 1222 (8th Cir.1990)) (stated that the Sentencing Guidelines must be strictly construed); *see also Dowling v. United States*, 473 U.S. 207, 212–214, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985) (penal laws are to be strictly construed). When the plain meaning of a criminal statute or guideline is ambiguous,

nations of their final rules, including the factual evidence supporting the rule, and respond to important comments from opponents, the Commission's explanations for its final guidelines are strikingly terse and conclusory." Ronald F. Wright, *Amendments in the Route to Sentencing Reform, Criminal Justice Ethics*, Winter/Spring 1994, at 58, 64 (cited in Stith and Cabranes).

11. The distinction between the terms "in furtherance of" or "in relation to," is not abundantly clear. For example, in the 1998 amended version of 18 U.S.C. 924(c)—an analogous criminal statute providing for mandatory minimum sentences for possessing firearms during a crime of violence or a drug trafficking offense—Congress expanded the statute to include not only a "person who, *during and in relation to* any crime of violence or drug trafficking crime . . . uses or carries a firearm," but also anyone who *"in furtherance* of any such crime *possesses a firearm."* See 18 U.S.C. § 924(c) (1998); H.R.Rep. No. 344, 105th Cong., 1st Sess.1997, 1997 WL 668339 (Leg.Hist.) (Providing discussion of the definition of "in furtherance of" and "in relation to").

According to its Legislative History, 18 U.S.C. § 924(c) was amended in direct response to the limiting effect of *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (Supreme Court narrowly defines the definition of "use" of a weapon). *See* H.R.Rep. No. 344, 105th Cong., 1st Sess. 1997, 1997 WL 668339 (Leg.Hist.). Even in its attempt to broaden the reach of the statute, Congress recognized the necessity of some limiting nexus language so as not to encompass every case, namely the "in furtherance of" language. The drafters of the amendment recognized that the distinction between "in furtherance of" and "during and

in relation to" is a subtle one, but believed that "in furtherance of" presented a slightly higher standard and encompassed the "during and in relation to" language. *See id.*

The Committee report defined "furtherance" as "the act of furthering, helping forward, promotion, advancement, or progress." The Committee believed that based on case law and the "usual" understanding of the words, "in furtherance of" required the government to "clearly show that a firearm was possessed to advance or promote the commission of the underlying offense." *Id.* The mere presence of a firearm in the area where the criminal act occurred would not be a sufficient basis for imposing this mandatory sentence. *See id.*

Furthermore, in its discussion of the term "during and in relation to," the Committee cited *Smith v. United States*, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) in which the Supreme Court enunciated the following test—"the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." *Smith*, 508 U.S. at 238, 113 S.Ct. 2050. The Court further explained that the "language allays explicitly the concern that a person could be punished . . . for committing a drug trafficking offense even though the firearm's presence is coincidental or entirely unrelated to the crime." *Id.*

Finally, in other sections of the Guidelines, the language of relationship between the gun and the offense varies. For example, both U.S.S.G. § 4B1.4 (Armed Career Criminal) and U.S.S.G. § 5C1.2 (Safety Valve) considers whether the defendant possessed a gun "in connection with" the offense, while formerly, U.S.S.G. § 2D1.1 used the term "during the commission of the offense."

the Supreme Court has consistently held that the rule of lenity requires the ambiguity be resolved in the defendant's favor. *See United States v. Bowen*, 127 F.3d 9, 13 (1st Cir.1997) (*citing United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 7–8 (1st Cir.1997) (collecting cases). Hence, "the Court will not interpret a federal criminal statute so as to increase the penalty that it. places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Bowen*, 127 F.3d at 13 (*quoting Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958)).

### 3. *The Purpose of the Enhancement*

The purpose of U.S.S.G. § 2D1.1(b)(1) is to heighten the punishment of an offender because of the "increased danger of violence *when* drug traffickers *possess* weapons." U.S.S.G. § 2D1.1, cmt. (n. 3) (emphasis added). It is a simple syllogism: Drug traffickers who are likely to resort to violence are more culpable than those who are not. Drug traffickers who are more likely to resort to violence are those with a meaningful connection to guns, ranging from those who actually use or brandish the guns, to those possessing the guns, to those with realistic access to them. The logical corollary is that the enhancement does not apply in situations where, because the guns are unrelated to the offense, or not available, there is no additional risk of harm.[12]

Mere presence of a gun is obviously not sufficient. The Commentary to the Guideline, for example, cites a situation in which an unloaded hunting rifle is present in a closet in the room in which the defendant is arrested. U.S.S.G. § 2D1.1 cmt. (n. 3). Presumably, in that case there is no relationship between the gun and the offense; nor is there meaningful access to the weapon, nothing that would make a resort to violence more likely. Therefore, the gun's presence alone cannot automatically lead to higher risk of harm.

### 4. *The Case Law*[13]

The First Circuit addresses the requirement of a nexus between gun and offense, although the precise contours are unclear for two reasons. Each case involved the review of a district court's decision finding the enhancement appropriate by the most deferential standard—abuse of discretion. Furthermore, as I describe below, some of the cases are less than clear on the issue of burden allocation.

12. In this respect the Guidelines sought to create a sentencing scheme that focused on both uniformity and proportionality. To achieve proportionality, the Commission identified potentially relevant features of criminal conduct, referred to as "specific offense characteristics," that would allow judges to tailor sentences according to each individual participant's role in the offense, in effect making the punishment fit the crime. *See* U.S.S.G. Ch. 1 Pt. A § 3.

13. The Supreme Court has addressed the issue of the relationship between gun and offense in the gun enhancement Guideline *in dicta*, and rather puzzling *dicta* at that. In *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the Court, interpreting 18 U.S.C. § 924(c), held that "use" of a firearm requires "evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at 143, 116 S.Ct. 501. In addressing concerns that the "active-employment" reading of use restricts the scope of § 924(c)(1), the Court noted that the government often has other means available to charge offenders who mix guns and drugs—most notably, U.S.S.G. § 2D1.1(b)(1). But the Court erroneously described the pre–1991 version of the Guideline as providing an "enhancement for a person convicted of certain drug-trafficking offenses *if the firearm was possessed during the offense*". *Id.* at 150, 116 S.Ct. 501 (citing United States Sentencing Commission, Guidelines Manual § 2D1.1(b)(1) (Nov.1994)) (emphasis added). The discussion, though in error in its specifics, suggests that even the Supreme Court believed the Guideline spelled out a connection with the offense somewhere between active use, to possession in relation to the offense.

While the court does not refer specifically to language like possession "in furtherance of," or "in relation to," it held that when (1) the weapon is *readily available;* (2) for the protection of the participants during the commission of the illegal activity or the drugs and cash involved, there is sufficient evidence to connect the weapon(s) to the offense conduct. *See Corcimiglia,* 967 F.2d at 727. Therefore, it is not the mere presence of the gun that gives rise to the connection, but, in effect, "presence plus."

Subsequent First Circuit cases have followed the spirit of this test, even if not in so many words. In various cases, the court applied the enhancement when the weapon was recovered in immediate proximity to the drugs and/or sale proceeds, and in a location that was in fact a site central to the drug transactions. *See e.g., United States v. Aker,* 1999 WL 420839 (1st Cir.1999) (car specifically used by defendant for dealing drugs contained two stashes of drugs, and a gun in the glove compartment, which was thus readily available); *United States v. McDonald,* 121 F.3d 7, 8–10 (1st Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 725, 139 L.Ed.2d 664 (1998) (cornucopia of drugs, money and paraphernalia found in parlor, and gun and ammunition found in bathroom vanity in defendant's one-bedroom apartment which served as command post for drug trafficking); *United States v. McFadden,* 13 F.3d 463, 464 (1st Cir.1994) (shotgun found with cash and drugs under bed where defendant had just retrieved drugs to sell to undercover agents); *United States v. Jackson,* 3 F.3d 506, 509 (1st Cir.1993) ("The weapon was found under the bed shared by Jackson and her codefendant, ammunition was beside the bed in

plain view, the apartment was used to traffic narcotics, and the gun was located only a few feet from where the cocaine was found."); *United States v. Pineda,* 981 F.2d 569, 571–573 (1st Cir.1992) (search of locked closet that defendant had key to and was standing in front of revealed drugs, scales, almost $25,000 in cash, drug paraphernalia and two guns); *United States v. Castillo,* 979 F.2d 8, 10 (1st Cir. 1992) (sale of gun with drugs qualifies for enhancement as weapon and ammunition were readily available to protect the drugs and money).

Additionally, even when the weapon was not present at the time of arrest, the First Circuit upheld the enhancement when the evidence established a clear connection between the weapon and the offense. *See United States v. Ovalle–Marquez,* 36 F.3d 212, 224–225 (1st Cir.1994); *cert. denied,* 513 U.S. 1132, 115 S.Ct. 947, 130 L.Ed.2d 891 (1995); 514 U.S. 1007, 115 S.Ct. 1322, 131 L.Ed.2d 202 (1995) (no guns were seized as a result of the arrest, but there was testimony of numerous guns being brandished and exchanged among co-conspirators during a large drug smuggling operation, and the defendant did not come forward with any evidence explaining the presence of the guns as unrelated to the offense).

■ Even if a weapon is present and readily available, the *Corcimiglia* standard may not be met if it does "not serve to protect or facilitate the offense conduct." *See United States v. Lagasse,* 87 F.3d 18, 21 (1st Cir.1996) (enhancement did not apply as robbing of co-conspirators was "not in furtherance of the drug conspiracy," instead it was adverse to interests of conspiracy). Mere presence is not enough.[14]

---

**14.** Prior to the specific language of *Corcimiglia,* the First Circuit still required a connection between the weapon and the offense. It clearly establishes that presence alone was not enough as the gun was not always located with the defendant. *See United States v. McDowell,* 918 F.2d 1004 (1st Cir.1990) (enhancement was appropriate as the defendant

was in an airport attempting to recover drugs from a locker, and the gun was discovered in the car he drove to the airport, presumably to transport the drugs); *United States v. Paulino,* 887 F.2d 358, 359 (1st Cir.1989) (loaded gun found in apartment with cash linked to the drug transactions, while drugs were found in separate unfurnished apartment in same

### B. *Who Bears the Burden of Proving Relationship?*

■ The question of which party has the burden of proving the elements of U.S.S.G. § 2D1.1(b)(1) is central to Juan's sentencing. The government argues, citing *Corcimiglia*, 967 F.2d 724, that once it establishes the gun's mere presence at the site of the transaction, First Circuit case law shifts the burden of proof to Juan to show that the gun's connection to the offense was "clearly improbable."

This is an extraordinary burden to place on Juan and wholly at odds with the rest of the Guidelines. He not only bears the burden of proving what is plainly an aggravating factor, typically for the government to prove, but his burden is only satisfied by the heightened standard of "clearly improbable," as opposed to by a "preponderance of the evidence," which is all the government has to show. *See United States v. Sklar*, 920 F.2d 107, 112 (1st Cir.1990) (finding that the government generally bears the burden of proving "facts central to increasing a defendant's offense level *by the preponderance of the evidence.*") (emphasis added).

#### 1. *The Language of the Guideline and the Commentary*

The Commentary to § 2D1.1(b)(1) does not expressly require this burden shifting. It does not, for example, state that the enhancement applies if the weapon was present, unless "the defendant demonstrates" that it was "clearly improbable that the weapon was connected to the offense." Significantly, it is framed entirely in the passive tense—a showing of whether the weapon "was present," and a showing of whether "it is clearly improbable" that the weapon and the offense were connected. It leaves the issue of burden allocation entirely up in the air.

Once again, I am obliged to draw distinctions without the help of the kinds of explanatory materials one might find with respect to other administrative regulations. Indeed, the Commentary does not even require approval by Congress, and has even fewer safeguards attached to its promulgation than the Guidelines. *See* Ira Bloom, *The Aftermath of Mistretta: The Demonstrated Incompatibility of the United States Sentencing Commission and Separation of Powers Principles*, 24 Am. J.Crim.L. 1, 7–8 (Fall 1996). Nevertheless, the Supreme Court held in *Stinson v. United States*, that I am obliged to follow the explanatory Commentary unless it is inconsistent with the Guidelines or violative of the Constitution. *See* 508 U.S. 36, 42–46, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

I find that the Commentary is not inconsistent with the U.S.S.G. § 2D1.1(b)(1) but only insofar as it is interpreted as follows: (1) the government establishes the presence of the firearm; (2) the burden of going forward—not the burden of proof[15]—shifts to the defendant to come forward with an explanation for the gun's presence (i.e. that it is not connected to the offense); and, (3) the burden of proof remains on the government to show the connection between the weapon and the underlying offense. At no time does the burden of

---

building, also rented to defendant). Even when the court stated that mere possession of a firearm could trigger the enhancement, the court clearly concentrated on the weapon's unique connection to the specific offense. *See United States v. Ruiz*, 905 F.2d 499, 507–08 (1st Cir.1990) (court imposed the enhancement because the weapon was closely linked to the powers and office which the "appellant [a police officer] used to implement his felonious activities.").

**15.** The burden of persuasion or "proof" is the amount of evidence that must be presented in order for the fact finder to find the facts in question. *See* Charles T. McCormick, *McCormick on Evidence* §§ 346, 987 (Edward W. Cleary ed., 1984). The onus on the party with this burden is to convince the trier of fact of all the elements of the case. *See* BLACK'S LAW DICTIONARY 196 (6th ED.1990) (defining aspects of the term "burden of proof"). The "burden of going forward" refers instead to the requirement that a party refute or explain, as opposed to prove facts. *See id.*

proof fall on the defendant, as the government claims.

If the government's interpretation of the Commentary is correct, then its entire burden would be satisfied by merely proving the gun's presence somewhere at the scene of the crime or the location of the defendant. That proof, and that proof alone, would suffice to shift the burden to the defendant to *disprove* any connection implied by the gun's presence.

The Guideline says nothing of the kind. It refers to establishing "possession" of a firearm to justify the enhancement, while the clause of the Commentary on which the government relies refers to the gun being "present." As noted above, whatever else "possession" means, it involves a more substantial burden than a showing of "presence."

The only interpretation that harmonizes the Guideline and the Commentary is that the government's burden of proof encompasses *both* requirements of the Commentary language—the presence of the gun, and its connection to the offense. Seen in this light, the Commentary is merely outlining the order of the proof: Initial burden on the government to show presence, burden of *going forward* on the defendant to provide an explanation for the gun's presence, but the final burden of *proof* always remains with the government to disprove that explanation, or provide affirmative proof of the connection.

This allocation of the burden makes sense in terms of general evidentiary principles, not to mention general Guideline principles. It is also consistent with the language of the First Circuit's seminal case, *Corcimiglia,* as well as that of at least two other circuits.

### 2. General Principles

Typically, the government bears the burden of proving factors that adversely affect a defendant's liberty.[16] To the extent that a defendant bears any burden in a criminal case, it is the burden of showing exculpatory circumstances. Thus, for example, the government must show the elements of murder, while self-defense is an affirmative defense.

In the context of the Guidelines, the government bears the burden of proving aggravating circumstances, the defendant, mitigating circumstances. *See* 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 303.06[3][[b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1997).

The gun enhancement is perhaps the prototypical aggravating circumstance. It leads to a finding of greater culpability, and under the Guidelines, more imprisonment. To hold that it is some kind of

---

**16.** In *Mullaney v. Wilbur,* 421 U.S. 684, 697–98, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), for example, a Maine statute defined murder as the unlawful killing of a human being with malice aforethought, while providing for a lesser offense if the defendant could prove, what amounted to an affirmative defense, that he acted in the heat of passion. The Supreme Court held this "affirmative defense" unconstitutional because it forced the defendant to disprove a factor which heightened the culpability of the offense. *See id.* While dealing with elements of the offense and considerations about the jury's role, the Court's general statement of principle is nevertheless instructive: "Elements affecting the degree of criminal culpability," or even elements "that would stigmatize the defendant and that might lead to a significant impairment of personal liberty," are considered to be elements of the crime which must be proved beyond a reasonable doubt. *Id.* at 698, 95 S.Ct. 1881.

Thus, the elements of the crime are those which enhance the culpability of the offense, while affirmative defenses are those in which the defense seeks to prove the existence of an exculpatory circumstance. *See* Michael R. Schechter, *Sentencing Enhancements Under the Federal Sentencing Guidelines: Punishment Without Proof,* 19 N.Y.U.L.Rev.L. & Soc. Change 653, 657 (1992/3).

This division—between offense elements and affirmative defenses—plainly dovetails with the Guidelines distinctions between aggravating and mitigating factors, U.S.S.G. § 3B1.1 and 3B1.2. While the defendant bears the burden of showing the latter, the government bears the burden of showing the former.

hybrid—half aggravating, half mitigating—would be to substantially muddy the difference between the two. As one commentator suggests, it would be tantamount to suggesting that *not* enhancing a sentence is the same as mitigating it. *See* Schechter, *supra* at 665.[17]

Furthermore, this distribution of the burdens makes sense: Once the government shows the presence of the gun at a location in which it could well be linked to the offense, the defendant is obliged to go forward with evidence explaining the gun's presence. The government begins with the information it possesses—that a gun was found, its location. The defendant comes forward with facts to which it is uniquely privy—the reasons for the gun's presence. The government cannot disprove that which it does not know. Once the defendant has come forward with the evidence, the government bears the ultimate burden of proof of showing the connection between the gun and the offense.

### 3. Case Law

#### a. The First Circuit

This construction of the Guideline/Commentary language is consistent with the rule laid out by the First Circuit case relied upon by both the government and the defense, *Corcimiglia*, 967 F.2d at 727–728. Although the government asserts that *Corcimiglia* shifts the burden of proving lack of connection to the defendant,

this is not an accurate reading of the case which provides: [18]

> [W]hen the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapons to the offense conduct. This in turn allows the district court to impose the two-level enhancement ... The burden then falls on the defendant to **come forward** with evidence demonstrating the existence of special circumstances that would render it 'clearly improbable' that the weapon's presence has a connection to the narcotics trafficking.

*Corcimiglia*, 967 F.2d at 727–728.

There is no mention of a shifting burden of proof. Under *Corcimiglia*, it is the government which must prove the nexus, and the only burden on the defendant is to "come forward" with evidence of alternative explanations for the gun's presence, not to disprove the connection. *See id.*

To be sure, subsequent First Circuit cases sometimes use language which suggests a burden shifting test—clearly a substantial change in approach—but without any analysis, much less any suggestion that they are reversing or altering *Corcimiglia*.[19] Instead of continuing the game

17. Schechter analogizes the situation to the Model Penal Code's distinction between aggravating and mitigating circumstances for criminal homicide. *See* Schechter, *supra* (citing Model Penal Code § 210.6(3)).

18. Cases dated earlier than *Corcimiglia* do not provide specifically for such a burden shifting test. In fact, in *United States v. Font-Ramirez*, 944 F.2d 42, 49 (1st Cir.1991) the court held that "[a]t sentencing, the government has the burden of proving, by a preponderance of the evidence, facts sufficient to support the sentencing enhancement." *See also United States v. Bianco*, 922 F.2d 910, 913 (1st Cir.1991).

19. Since the First Circuit's 1992 decision in *Corcimiglia*, the defendant's burden of coming forward has been mutated into what has

been interpreted as a shift of the burden of proof. Even though *Corcimiglia* is still widely cited as the governing rule, the specific words—"burden of coming forward."—slowly dropped from the language applied in subsequent cases without analysis or discussion. *See e.g., Jackson*, 3 F.3d at 509 (when it has been shown that the firearm was present, the relevant inquiry is whether it is "clearly improbable" that the weapon could have been used during the offense. *Defendant bears the burden of demonstrating* that the connection was clearly improbable) (citing *Corcimiglia*); *Lagasse*, 87 F.3d at 22 (once the nexus is established, the defendant may avoid the enhancement *only* by *demonstrating* special circumstances, which defendant did in that case). *But see Castillo*, 979 F.2d at 10 & n. 3 (defendant must demonstrate the existence of

of judicial "telephone," and apply select phrases out of the context of the original case, I will follow *Corcimiglia*'s language—that the defendant has the "burden of coming forward"—for the reasons I have described above.

Finally, this stated rule is consistent with two other circuits which have struggled with this same question.

### b. *The Third Circuit*[20]

The Third Circuit, without discussion, has stated that the government must prove (1) that the defendant possessed the weapon, and (2) that the connection between the firearm and the drug-related offense is not "clearly improbable." *See United States v. Price*, 13 F.3d 711, 733 (3rd Cir.1994); *cert. denied*, 514 U.S. 1023, 115 S.Ct. 1372, 131 L.Ed.2d 227 (1995). In fact, the Third Circuit specifically rejected the argument by the government that the defendant had the burden of showing the "improbability" of a connection between the gun and drug trafficking. *See United States v. Rowland*, 1996 WL 524090, * 2 (E.D.Pa.) (government had burden of proving affirmative connection between gun and trafficking); *United States v. Ortiz*, 31 F.Supp.2d 469, 471 (E.D.Pa.1999) (defendant did not have the burden of disproving enhancement).

In other words, the government must first prove the connection between the defendant and the gun—possession—and then it must prove a nexus between the gun and the drug trafficking offense. *See United States v. Pitts*, 3 F.Supp.2d 637, 640 (E.D.Pa.1998).

### c. *The Eighth Circuit*

The Eighth Circuit has also held (and is cited often for this position) that the burden *never* shifts to the defendant, but rather that the government must show (1) that the dangerous weapon was present; and (2) that it was not clearly improbable that the weapon had a nexus with the criminal activity. *See United States v. Richmond*, 37 F.3d 418, 419 (8th Cir.1994), *cert. denied*, 513 U.S. 1178, 115 S.Ct. 1163, 130 L.Ed.2d 1119 (1995) (police responded to a complaint of Richmond threatening neighbors by brandishing gun and subsequently discover loaded gun and drugs); *United States v. Bost*, 968 F.2d 729, 732 (8th Cir. 1992) (government must prove the relationship); *Khang*, 904 F.2d at 1221–1223

---

special circumstances, although the government bears the ultimate burden of proving facts central to increasing the defendant's offense level); *United States v. Gonzalez–Vazquez*, 34 F.3d 19, 24 (1st Cir.1994) (discussion of the difference in the burden of proof between the Guideline and 18 U.S.C. § 924(c); finding that once the presence of the firearm has been established *the burden then shifts to the defendant to show **or at least produce*** some evidence of special circumstances); *Ovalle–Marquez*, 36 F.3d at 224–25 (quoting *Corcimiglia* test without revision).

By 1997 the "burden to demonstrate" test referred to in *Jackson* (which was wrongly attributed to *Corcimiglia* ) became cited as a "burden of persuasion test." *See McDonald*, 121 F.3d at 10 (citing *Jackson*, 3 F.3d at 509) (once the government has shown a firearm was possessed during the commission of the offense, the *burden shifts to the defendant to persuade* the fact finder that a connection between the weapon and crime is clearly improbable); *see also United States v. Mateo–Sanchez*, 166 F.3d 413, 417 (1st Cir.1999) ("Once the government demonstrated that the

weapon was 'readily available' to protect either the participants themselves … or the drugs … the *burden shifted to the defendants to persuade the court* that the connection between the weapon and the crime [wa]s clearly improbable.").

Although cases like *Jackson* and *McDonald* do not state that they are formally overruling *Corcimiglia* (on the contrary, *Jackson* proposed to follow *Corcimiglia*, and *McDonald* proposed to follow *Jackson* ), their language arguably alters the substantive meaning of the standard laid out by *Corcimiglia*.

**20.** As noted by the government, other circuits have either upheld a "burden of proof shifting" approach, or are at best ambiguous on what test they are actually applying. *See e.g., United States v. McGhee*, 882 F.2d 1095 (6th Cir.1989); *United States v. Durrive*, 902 F.2d 1221 (7th Cir.1990); *United States v. Restrepo*, 884 F.2d 1294 (9th Cir.1989); *Roberts*, 980 F.2d 645 (10th Cir.1992); *United States v. Hall*, 46 F.3d 62 (11th Cir.1995). For a critique of *Restrepo, see* Schechter, *supra* at 662–664.

(finding that the government ˙stipulated that the firearm had no relationship to the crime).

While the Third Circuit is silent on its reasoning, the Eighth Circuit carefully outlines it. *See id.* The court began by finding that the government had the burden of proof for this enhancement because it is an aggravating factor. *See id.* at 1222 (citing *United States v. Wilson,* 884 F.2d 1355, 1356 (11th Cir.1989)). The court then considered Congress' intent in developing the Guidelines [21] and the Specific Offense Characteristics.[22] In light of these policies, and the fact that the burden of proof falls on the party asserting the sentencing adjustment, the court held that the government must establish a relationship between the defendant's possession of the firearm and the offense. *See id.* at 1223. The Eighth Circuit rejected the interpretation of the commentary language—"unless it is clearly improbable"—as placing the burden of persuasion on the defendant to disprove the enhancement. Instead it interpreted this language as a standard of proof regarding the government's burden, which never shifts to the defendant. *See id.* at 1222 n. 5.

### C. *The Nature of the Burden—"Clearly Improbable"*

The government's position is inconsistent with the Guidelines for yet another reason. It places on Juan the burden of showing that the gun's relationship to the offense is "clearly improbable." As Judge Weinstein has explained, the various burdens of proof constitute a continuum. *See United States v. Fatico,* 579 F.2d 707 (2nd Cir.1978); *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 458 (1979). The preponderance standard is the most appropriate in those disputes in which the law is essentially indifferent as to outcome. In contrast, in criminal cases, where there is loss of liberty and stigma, the highest standard, beyond a reasonable doubt, is imposed. Although many commentators have criticized these decisions, it is clear that the standard of proof imposed on the government for aggravating circumstances in sentencing is only the former. *See McMillan v. Pennsylvania,* 477 U.S. 79, 91–92, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). In this light, it would make no sense to impose a more rigorous standard on the defense, like "clearly ˙improbable", and to do so with respect to this issue and none other.

### IV. *THE STANDARD AS APPLIED TO THE FACTS*

■ The government has shown the presence of the firearm somewhere in the room where Juan was arrested, and where drugs were found. Juan came forward with an explanation. He purchased the gun to protect himself and his store from robberies. When these problems subsided, he took the gun home, made sure it was unloaded, hid it behind the television, and forgot about it. The government at that point had the burden of proving the nexus—that it was not clearly improbable that the gun was connected with the offense.

The government cannot make this proof because its case was, in a word, incoherent. It could not establish who found the gun, or when, and surely not where. There was conflicting testimony—who seized the gun in the first instance, the Boston police or the DEA, when the gun was found, a half an hour or one and a half hours after entry into the house, and where the gun was

---

**21.** The court found that the Sentencing Commission premised its development of the Guidelines on Congress' desire to punish similarly situated defendants for all the possible harms of particular criminal conduct. It sought to achieve this objective through honesty, uniformity, and proportionality in sentencing. *See id.* at 1222–23.

**22.** The focus of the Specific Offense Characteristics was to integrate uniformity and proportionality by considering the relationship of the conduct to the harm or risk of harm it creates. *See id.* at 1223.

located: (a) essentially in plain view and thus readily available on a window ledge near the door, or (b) on a wooden molding of some sort—which could be part of a television cabinet (and somewhat consistent with Juan's account) or (c) behind some door—although not clear which one. Given the length of the time that the search took—between 30 minutes to an hour and a half—of a room that was only 20 × 15 square feet, the most reasonable explanation is that the gun was well hidden.[23]

Moreover, most of the transactions for drugs were conducted at various locations, mainly public places (a restaurant, in a car, in the market), and not in the basement of 74 Chestnut Street. In fact, on the day of arrest, after a complete search of the house, it was determined that no other drugs were being stored in the house, apart from the drugs in the bag which the defendant's brother brought with him when he entered the house.[24] If the gun were connected to the drug transactions, one would expect to find it in Juan's car, or on his person, or in the market, where the CS reported most of the drug activity took place. In contrast, photos obviously taken before the defendant's arrest show that the basement was used for family gatherings to watch television or otherwise socialize.

Finally, the gun was never used, never seen, never mentioned or referred to, and no violence was ever even hinted at.

I conclude that the government has not met its burden of proof with respect to this enhancement.

## V. CONCLUSION

Accordingly, I sentence Juan to 46 months on counts one through five, to be served concurrently, and 3 years supervised release.[25]

**SO ORDERED.**

---

**23.** In this regard, I give limited credence to the testimony of Aquino that she never saw the gun. She testified to the family's regular use of the basement quarters (a position confirmed by pictures introduced into evidence of family gatherings in the basement). Given the age of her child, it would not be unreasonable for her to be particularly concerned about ready access to a firearm. At the same time, she testified that she had no inkling of Juan's drug dealing, or the drugs in the basement. The only plausible explanation is the one that the facts suggest—that most of Juan's activities took place outside of the basement and that the guns and the drugs were well hidden.

**24.** To be sure, in the very first transaction, the defendant apparently went to Chestnut street to retrieve the drugs.

**25.** Juan also raised concerns regarding the likelihood that upon his release that he would be detained by the Immigration and Naturalization Service, pending deportation. Due to his Cuban nationality, Juan suggests that he could face indefinite INS detention, even if he is rendered deportable. I invited Juan to research this matter further and submit appropriate motions.